IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **WILLIAM BUCK,** **#R21689,** <br><br> Plaintiff, <br><br> v. <br><br> **CORTNEY MEYERS,** **MELISSA PAPPAS,** **JACOB WEATHERFORD, and** **BRANDY TRIPP,** <br><br> Defendants. | Case No. 17-cv-00270-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

At the start of day four of trial, after the close of Plaintiff William Buck's case and hearing testimony from Defendants Pappas and Weatherford, the Court heard arguments on the oral motion for judgment as a matter of law made by Defendants Pappas, Meyers, Tripp, and Weatherford pursuant to Federal Rule of Civil Procedure 50(a). The Court granted the motion as to Count 4 against Defendant Tripp and reserved ruling on the motion as to Count 1 against Defendants Meyers, Pappas, and Weatherford. After the close of evidence, Defense Counsel renewed the motion for a directed verdict as to the remaining Defendants. The Court heard oral arguments and granted the motion as to Defendants Meyer, Pappas, and Weatherford.

Federal Rule of Civil Procedure 50 "allows a court to enter judgment as a matter of law as soon as it becomes apparent that a plaintiff cannot establish an essential element of her claim." *Greene v. Potter,* 557 F. 3 765, (7th Cir 2009). Rule 50 provides that:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that…can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1). For the reasons stated on the record and below, it is clear that Plaintiff Buck cannot prove his claims against Defendants Pappas, Weatherford, Meyers, and Tripp.

***Defendant Tripp (Count 4)***

When presenting his case against Nurse Tripp for deliberate indifference to a serious medical need (Count 4), Buck testified that he was injured on November 20, 2016, when Correctional Officer Slavens grabbed, pulled, and twisted his right arm through the chuckhole door. As a result, his hand was badly injured, his foot cut, and he sustained a puncture wound to his knee. Following the incident, he was bleeding and experienced pain. The following day, November 21, 2016, Buck testified he was injured again when Sergeant Young sprayed him with pepper spray and grabbed and twisted his left hand through the chuckhole door.

Buck further testified he was taken to the healthcare unit and was seen by Defendant Nurse Tripp on November 22, 2016. Initially he testified that by November 22 he had bled through the Band-Aids he had previously been given by another nurse for his toe and knee injuries, but later he testified that his Band-Aids were intact at the time of his visit with Tripp. Buck stated that he was in the exam room for only a minute, and Tripp did not give him any medical treatment. When asked by the Court how Tripp denied him medical treatment, Buck responded generally that Tripp did not give him anything. Later he clarified that Tripp did not give him anything for his pain. Buck further testified that Tripp falsely recorded in the medical records that he did not make any complaints during the visit.

The next day, November 23, 2016, Buck testified he was seen by a nurse practitioner ("NP"), Mike Moldenhauer. He stated he brought the same complaints to NP Moldenhauer. In

support of his testimony, Buck offered his medical record from his appointment with NP Moldenhauer as an exhibit.[1] NP Moldenhauer recorded his observations as no swelling, deformity, or discoloration as to Buck's wrist and that the toe and knee had "superficial" scraps and "no puncture wound." NP Moldenhauer also noted that Buck's bandages were intact and there were no signs of infection. According to the medical record and Buck's testimony, NP Moldenhauer gave him over the counter pain medication and ordered x-rays. Buck did not put forth any arguments against the accuracy of this medical record. Buck also offered as an exhibit the results of his x-rays, which reported Buck had a "mild irregularity at the right distal 5th metacarpal shaft could represent an old fracture deformity."[2] Buck argued that he was in pain and provided pain medication by NP Moldenhauer, which could have been provided a day earlier by Tripp.

When presenting his case, Buck also examined witness Kato Buck. Ware testified he was housed in the cell next to Buck in November 2016, and he did not witness Buck receiving any medical attention after the instances of excessive force on November 20 and 21. However, Ware did not testify as to witnessing Buck's injuries or Buck's interaction with Tripp. Ware did not remember Tripp when asked by the Court.

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on an Eighth Amendment medical claim, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). The first consideration is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster,* 658 F. 3d 742, 750 (7th Cir. 2011). The second consideration requires the prisoner to show that the "defendant actually knew

---

[1] Defendants did not object to the admission of Exhibit 230.
[2] Defendants did not object to the admission of Exhibit 409.

of a serious health need and acted with deliberate indifference to the plaintiff's suffering." *Howell v. Wexford Health Sources, Inc.,* 987 F. 3d 647, 653 (7th Cir. 2021) (citations omitted).

Drawing "all reasonable inferences in" Buck's favor, the Court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find" that Buck suffered from a serious medical need at the time he was seen by Defendant Tripp. *See* FED. R. CIV. P. 50(a)(1). Buck does not dispute that on November 23, the day after seeing Tripp, his wrist was not swollen or bruised, his knee and toe had only superficial scraps, and his Band-Aids were still intact. There is no evidence that his condition was significantly worse the day prior, on November 22, during his visit with Tripp. Superficial scraps are not "sufficiently serious or painful to make the refusal of assistance uncivilized." *Gutierrez v. Peters,* 111 F. 3d 1364, 1372 )(7th Cir. 1997) (quoting *Cooper v. Casey,* 97 F. 3d 914 (7th Cir. 1996). Thus, the injuries to his knee and toe do not rise to the level of a serious medical condition.

As for Buck's injured wrist and hand, even assuming his hand had been fractured by the use of excessive force,[3] there was no signs of serious injury at the time Tripp saw him. Even after the fracture was discovered through the use of an x-ray, Buck did not offer any evidence that the injury was so significant that further medical treatment was determined to be necessary or prescribed by a medical professional. A serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F. 3d 1364, 1373 (7th Cir. 1997) (citations and quotations omitted). Buck's hand and wrist injury did not require further medical treatment, nor was it visibly obvious that a doctor's attention was needed on November 22, 2016. Therefore, there is no evidence for the jury to conclude that the injury to his hand and

---

[3] It has not been established that the fracture was caused by the events of excessive force on November 20, 2016, but the Court views the evidence in a light most favorable to Buck. *See Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries,* 272 F. 3d 441, 449 (7th Cir. 2001).

wrist constituted a serious medical need.

Finally, Buck testified that at both appointments on November 22 and 23, he complained of pain, but Tripp acted with deliberate indifference by not treating that pain. During oral argument, Buck stated that NP Moldenhauer adequately treated the pain with over the counter pain medication. While chronic and severe pain can constitute a serious medical need, a condition warranting only over-the-counter pain killers is not "serious" for the purposes of an Eighth Amendment violation. *See Rowe v. Brown,* No. 11-cv-01110-TWP-DKL, 2014 WL 1883810, at *5 (S.D. Ind. May 9, 2014) (holding that "back pain from a pulled muscle lasting less than two weeks which could be adequately treated with over-the-counter medication—is not a serious medical need under the Eighth Amendment"). *See also Montes v. Ponce Municipality,* 79 F. App'x 448, 451 )(1st Cir. 2003); *Green v. Senkowski,* 100 F. App'x 45, 47 (2d Cir. 2004). Because Buck testified that his pain was adequately treated with over-the-counter pain medication a day after he complained to Tripp, the pain he experienced does not rise to the level of a serious medical condition. *See Diaz v. Godinez,* 693 F. App'x 440, 443 (7th Cir. 2017) (noting that *repeatedly* turning a blind eye to a prisoner's complaints of treatable pain can constitute an Eight Amendment violation).

Based on the evidence and testimony presented by Buck, he has not shown as a matter of law that he had a serious medical need at the time he saw Tripp on November 22, 2016. Accordingly, Defendants' motion for judgment as a matter of law is granted as to Defendant Tripp.

***Defendants Pappas, Weatherford, and Meyers (Count 1)***

Buck also proceeded to trial against Defendants Pappas, Weatherford, and Meyers for subjecting him to unconstitutional conditions of confinement while he was on suicide watch between October 27, 2016 and December 7, 2016 (Count 1). During this time, Buck was housed in three difference cells: cell 309 located in the healthcare unit, cell 507 located in North 2

Cellhouse, and cell 217 located in North 2 Cellhouse. He claims that these cells were filthy, smeared with blood and feces, and he was given soiled mattresses.[4] Defendants Pappas, Weatherford, and Meyers were mental health professionals at Menard who visited Buck while he was on crisis watch at his cell door in order to assess his mental health condition. These visits were also referred to as "daily crisis contact."

Buck testified that cell 309, located in the healthcare unit from October 26, 2016, until November 12, 2016, was dirty and his mattress was soiled and smelled of urine. He testified that while in the healthcare unit in cell 309, he did not notify Defendants Weatherford, Meyers, or Pappas about the conditions of his cell. He stated that he refused to talk to them.

Buck testified that on November 12, 2016, Pappas came to his cell and told him he was leaving the healthcare unit. He overheard Pappas talking to other officers saying that another inmate, Anthony Gay, went to the hospital night before after cutting himself and that Buck would be moving to Gay's previous cell, cell 507 in North 2 Cellhouse. He also testified that Pappas said he was being transferred as punishment because he would not speak to her but continually asked to speak to Dr. Butler. Buck was then moved to crisis watch cell 507 in North 2. Buck testified that the cell was disgusting. After Gay committed self-harm in the cell, the cell had not been cleaned and blood was everywhere. Buck stated that the cell was also contaminated with feces, mold, and saliva. He further testified that once moved to cell 507, he immediately started complaining about the conditions, but also testified that he again refused to speak to mental health

---

[4] When presenting his case, Buck spent a lot of time attempting to demonstrate that Defendants Pappas, Weatherford, and Meyers were intentionally punishing him for refusing to speak to them and repeatedly asking to speak to Dr. Butler, the psych administrator. He claims that they retaliated against him by denying him adequate mental health care, moving him from the healthcare unit too soon, placing him in segregation cells that were small, and denying him out of cell time and property, including hygiene items. However, the Court finds and stated on the record, that none of these allegations, including the size of the cell, is relevant to whether his cells were in an unsanitary state, covered in feces and blood, and whether Defendants knew about and disregarded the severity of his living conditions and the risk to his health. (Count 1).

professionals, including Pappas, Meyers, and Weatherford. Buck repeatedly asked to speak to Dr. Butler.

Kato Ware, who was also on suicide watch in Gallery 5 North 2 and celled next to Buck, testified that prior to Buck being transferred to cell 507, the previous inmate celled in cell 507, Anthony Gay, had cut himself in the cell. Ware believed there was blood in the cell because he saw Gay bleeding as he was taken away from the cell. Ware testified that he could not see inside cell 507 due to the position of his cell, but stated that at some point he remembers a previous tenant of cell 507 smearing feces around inside the cell. Ware could not remember the name of the inmate or when this incident occurred. His belief that cell 507 was contaminated with feces and blood was based on comments he heard from correctional officers. Ware could not name or describe these officers. Ware testified that he never saw anyone clean cell 507 prior to Buck being placed there. Ware further testified that he never witnessed a mental health professional assist Buck regarding the conditions of his cell.

Buck testified that on November 23, 2016, Meyers came cell 507 and told him that he was being moved again. Buck was then transferred to cell 217 in North 2. He testified that the conditions of cell 217 were worse than cell 507. However, he continued not to speak to Weatherford, Meyers, or Pappas about the cell conditions while in cell 217.

Buck argued that while he is aware that mental health professionals do not physically clean the cells themselves, they have a responsibility to ensure the cells are clean and have a duty to report filthy living conditions. In support of this argument, he submitted as evidence a blank form titled "Mental Health Segregation Rounds."[5] The form has a section for the staff member to note cell appearance as either "good, fair, or poor." At the bottom of the form are instructions for the

---

[5] Defendants did not object to the admission of Exhibit 339 (also referred to during trial as "DOC 380").

staff member filling out the form to notify the lieutenant assigned to the cell house if the cell appearance is indicated as "poor." Defendants Meyers and Weatherford testified that this form is filled out for inmates in segregation by a mental health professional doing rounds once a week in the segregation unit. For Buck, Defendant Weatherford filled out this form on November 29, 2016, and another mental health professional filled out the form on December 6, 2016.[6] On both dates, Buck was celled in cell 217 and the cell appearance was noted as "good." Buck pointed out that Weatherford, on November 29, 2016, noted in a separate psych note that he could not see into Buck's cell that day because Buck would not turn on the cell light.[7] He argued that this inconsistency between the psych note and the Mental Health Segregation Rounds form shows that Defendants' records were inaccurate.

Defendants Meyers, Weatherford, and Pappas all testified that during the times they visited Buck at his cell they did not witness blood, feces, saliva, or other obvious contaminants spread in the cell. They also did not smell any feces or foul odors. Each Defendant stated that they could see into Buck's cells, and if they had witnessed filthy conditions, then they would have recorded it in their notes and notified the appropriate security officer. When asked by the Court, Weatherford stated that the condition of the cell is relevant not only for ensuring a cleanly living environment, but also for the purposes of assessing the inmate's mental status.

Prison officials violate the Eighth Amendment when "they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To succeed on a claim of deliberate indifference to a condition of confinement, a prisoner must show: (1) a deprivation that is, from

---

[6] Identified on the record as "page 1347" and "page 1343."
[7] Identified on the record as document 887.

an objective standpoint, sufficiently serious that it results in the denial of the minimal civilized measure of life's necessities or the denial of basic human needs; and (2) prison officials were deliberately indifferent to this state of affairs. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quotation marks and citation omitted); *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). To be found liable "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Even if a jury believed Buck's testimony that his cell was contaminated with feces, blood, saliva and other contaminates, Buck has failed to put forth evidence for a reasonable jury to conclude that Defendants Pappas, Weatherford, and Meyers were aware of the filthy and unsanitary conditions of his cells and had knowledge that such conditions exposed him to a strong likelihood of harm. Buck testified that after moving to cell 507 he began complaining about his cell conditions, but to whom he complained is unclear. He testified he refused to talk to Defendants Meyers, Pappas, and Weatherford the entire time on crisis watch, and he did not report to them the severity of his living conditions, the location of any fecal matter or blood, or request cleaning supplies. He also did not inform them that the infection in his mouth following oral surgery was worsening or that his mental health was deteriorating and causing deeper depression due to the cell conditions. Buck and Defendants all testified that the Defendants did not ever enter the cells, and they did not have keys to open the cell doors.

Although Defendants could see into his cell, Buck stated that the cell visits with Defendants were very brief, with little to no interaction. When presenting the photos of cells 309, 507, and 217, which were taken in preparation for this trial in 2021, Buck testified that the conditions of the cells, as portrayed in the photos, were basically the same as when he was housed in those cells in 2016. The cells in those pictures were small, old, and had stains and rust on the walls and doors.

But the conditions of the cells as depicted in the photos did not rise to the level of filth as claimed by Buck – visible blood, feces, saliva, and urine smeared all over the walls, floors, and doors. Kato Ware testified that he did not see the cell 507 cleaned prior to Buck's placement in the cell, but he also did not personally see the inside of the cell and could not speak to what was or was not visible from the window. Buck stated that while in cell 507, the entire gallery had an odor, not just his cell. So, there is also no evidence that Defendants could have inferred the condition of his cells from the smell.

As for the discrepancy in Defendant Weatherford's notes, the fact Weatherford noted he could not visibly see inside the cell in a psych note written on November 29, 2016, and then on a separate Mental Health Segregation Rounds form for the same time period recorded that the cell appearance as "good," is not evidence that he knew the cell was in an unsanitary state.

Finally, Buck did not offer any evidence that Defendants had any role in cell assignments, cell cleaning, or mattress distribution.

The Court finds that the jury does not have sufficient evidence to reasonably determine that Defendants Meyers, Pappas, and Weatherford were aware Buck was being housed in conditions which posed a substantial risk of serious harm to him and that they then failed to take any type of corrective action. Thus, the Court grants judgment as a matter of law as to Defendants Meyers, Weatherford, and Pappas.

As stated above and on the record, the Court **FINDS** that Plaintiff Buck has not established either a claim for inadequate medical care against Defendant Tripp or unconstitutional conditions of confinement against Defendants Meyers, Weatherford, and Pappas. Accordingly, the Court **GRANTS** Defendants' motion for judgment as a matter of law and does not present any counts to the jury for deliberation. Counts 1 and 4 are **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment for Defendants Tripp, Meyers, Weatherford, and Pappas at the

close of this case.

As the settlement agreement between Buck and the IDOC Defendants is still being finalized, the Court will not enter a final judgment order until the parties have notified the Court that the settlement has fully been implemented, including the rendering of payment to Buck.

If Buck wishes to file an appeal, he will have 30 days from the entry of judgment to file a notice of appeal. *See* FED. R. APP. P. 4(a)(1)(A); 28 U.S.C. § 1291 ("The courts of appeals…shall have jurisdiction of appeals from all final decision of the district courts of the United States…"). Buck is advised he will be liable for the $505.00 appellate filing fee irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger,* 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza,* 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998).

**IT IS SO ORDERED.**

**DATED:** March 8, 2022

 _s/ Stephen P. McGlynn_
**STEPHEN P. MCGLYNN**
**United States District Judge**